**2021 UT 69**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

HITORQ, LLC and Dr. Lisa Pasquarello,
*Petitioners*,

*v.*

TCC Veterinary Services, Inc., Dr. Tyler S. Stiens, Artz Vetmed
Services, PLLC, and Dr. John Artz,
*Respondents*.

No. 20200704
Heard September 16, 2021
Filed December 16, 2021

On Certiorari to the Utah Court of Appeals

Third District, Summit
The Honorable Kara Pettit
The Honorable Kent R. Holmberg
No. 160500473

Attorneys:

Stephen K. Christiansen, Heidi K. Gordon, Salt Lake City, for
appellants

Joseph E. Wrona, Brian A. Flach, Park City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE PEARCE and
JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 Doctors Lisa Pasquarello, Tyler Stiens, and John Artz owned
and operated a veterinary clinic in Park City. Together they formed a
limited liability company for their clinic and adopted an operating
agreement that contained an arbitration clause. After a few years, Dr.
Pasquarello sought to sell her portion of the practice to Dr. Artz
through an oral agreement. When the sale failed, she brought suit
against Dr. Artz for various claims, including breach of contract and

breach of the covenant of good faith and fair dealing. She also sought dissolution of the practice. Based on its interpretation of the arbitration clause in the operating agreement, the district court compelled arbitration, concluding that the claims fell under the scope of the clause. Dr. Pasquarello appealed, arguing that the arbitration clause covers only disputes regarding the enforcement or interpretation of the operating agreement and that her claims concern only the oral contract and the statutory remedy of dissolution. The court of appeals affirmed the district court. Because each of Dr. Pasquarello's claims relates to enforcement or interpretation of the operating agreement, we also affirm.

## Background

¶2 Doctors Pasquarello, Stiens, and Artz adopted an operating agreement when they formed a limited liability company for their veterinary clinic. The agreement included an arbitration provision stating that "[a]ny Member involved in a dispute regarding the enforcement or interpretation of this Agreement may elect to have such dispute referred to non-binding mediation or binding arbitration." The parties also formed a real estate company to own the building in which the clinic operated. The real estate company's operating agreement did not include an arbitration provision.

¶3 Each veterinarian is separately the sole owner of a limited liability company or a corporation. Through these separate entities, each veterinarian holds a membership interest in both the clinic's practice and the real estate company. Specifically, Dr. Pasquarello is the sole member of HITORQ, LLC. HITORQ owns a 25% interest in the clinic's practice and in the real estate company. Dr. Artz is the sole member of Vetmed Services, PLLC. Vetmed owns 25% of both companies. Dr. Stiens is the sole owner of TCC Veterinary Services, Inc. TCC holds the remaining 50% interest in the practice and real estate company.

¶4 In September 2015, Dr. Artz agreed to purchase Dr. Pasquarello's membership interests in the clinic and the real estate company. Their oral agreement did not incorporate an arbitration provision. Dr. Pasquarello contends she told Dr. Artz she planned on working at the clinic until the sale closed and, further, planned on continuing to work at the clinic if the sale did not close. Drs. Pasquarello and Artz scheduled the sale's closing date for November 14, 2015, shortly before Dr. Pasquarello would move to North Carolina. But the sale failed in negotiations.

¶5 Around this time, according to Dr. Pasquarello, Drs. Artz and Stiens prevented her from continuing to work at the clinic. In

contrast, Drs. Artz and Stiens claim that Dr. Pasquarello had announced that her last day of work would be November 13, 2015.

¶6 Eventually, Dr. Pasquarello moved to North Carolina and the veterinarians stopped negotiations regarding the sale of her ownership interests. In June 2016, Drs. Artz and Stiens voted to expel Dr. Pasquarello from membership in the clinic for lack of economic production because she had not worked there since November the year before.

¶7 Unhappy with this outcome, Dr. Pasquarello filed a lawsuit on behalf of herself and HITORQ (hereinafter Dr. Pasquarello) against Dr. Artz and Vetmed Services (hereinafter Dr. Artz), and Dr. Stiens and TCC Veterinary Services (hereinafter Dr. Steins) in November 2016. In her complaint, she relied on the terms of the oral purchase agreement and language from Utah Code section 48-3a-701(5)(b), which allows for judicial dissolution of a limited liability company when a member or members have acted in an oppressive or harmful manner to another member. She also referenced the operating agreement to support aspects of her claims. Dr. Pasquarello presented three claims relevant to this appeal.

¶8 First, she alleged that Dr. Artz breached the terms of the oral agreement to buy her membership interests in the clinic and the real estate company. She claimed he did so by failing to prepare and execute the purchase agreement, failing to pay her share of profits and accounts receivable up to the planned closing date, and preventing her from working at the clinic when the sale did not go through.

¶9 Second, Dr. Pasquarello alleged that Dr. Artz breached the implied covenant of good faith and fair dealing of the oral agreement. She claimed he did so by failing to secure financing and close on the purchase while still taking her clinic debt payments, which prevented her from meeting her own financial obligations. She also claimed that Dr. Artz made false representations to induce her to believe the purchase would occur, which stopped her from selling to a third party before she moved to North Carolina. Then, according to Dr. Pasquarello, Dr. Artz denied her the right to work prior to voting to expel her from membership in the clinic.

¶10 Last, she sought judicial dissolution of the clinic and the real estate company on the ground that Drs. Artz and Stiens had acted illegally and oppressively by preventing her from working and then ousting her from the company on the pretext that she had not been economically productive. She claimed they denied her "the rights and benefits of membership in both" the clinic and real estate

company, "changed the character, profits and losses" of the clinic, and "devalued" her membership in it.

¶11 In response to Dr. Pasquarello's lawsuit, Dr. Artz, joined now by Dr. Stiens, filed a motion in district court to compel arbitration under the operating agreement. They argued that Dr. Pasquarello's allegations that they had failed to pay profits and wrongfully excluded her from the clinic related to duties imposed by the operating agreement, so the claims required enforcement or interpretation of the operating agreement and were therefore subject to its arbitration provision.

¶12 Dr. Pasquarello countered that her contract claims were premised on the oral purchase agreement, not the operating agreement. She also argued that her dissolution claim was grounded in statute, not the operating agreement. But the district court concluded that the case involved a dispute regarding the enforcement or interpretation of the operating agreement and so referred the claims to arbitration.

¶13 During the arbitration process, Dr. Pasquarello filed a motion in district court to stay the arbitration, value her membership interests, and direct their sale, arguing that the valuation and sale of her membership interests were not subject to the operating agreement's arbitration provision. Drs. Artz and Stiens opposed the motion, contending that once the district court referred the dissolution claim to arbitration, the purchase of Dr. Pasquarello's membership interests became subject to arbitration. The district court denied Dr. Pasquarello's motion, so the parties returned to arbitration.

¶14 The arbitrator ruled in favor of Drs. Artz and Stiens on the contract and good faith claims. He also determined that dissolution was "not a viable remedy" and instead determined the value of Dr. Pasquarello's interests and directed their sale.

¶15 Dr. Pasquarello then filed a motion to vacate the arbitration award, reviving the argument from her motion to stay that the arbitrator "exceeded his authority in deciding issues beyond the scope of the parties' arbitration agreement." The district court again disagreed and confirmed the arbitration award.

¶16 Dr. Pasquarello appealed the district court's confirmation, arguing that the district court erred in granting the motion to compel arbitration and further erred in refusing to stay the arbitration proceedings.

¶17 On appeal, the court of appeals assessed whether Dr. Pasquarello's claims fell within the scope of the operating agreement's arbitration provision, concluding that "Utah's strong policy favoring arbitration" weighed against vacating the arbitration award.[1] It concluded that the claims, although somewhat tangential to the operating agreement, fell within the scope of the arbitration provision because their resolution required construction of, and reference to, provisions of the operating agreement.[2]

¶18 Dr. Pasquarello filed a petition for writ of certiorari, arguing that the court of appeals erred in affirming the district court. We granted certiorari on a single issue: "Whether the Court of Appeals erred in affirming the district court's referral to arbitration of claims for breach of contract, breach of the covenant of good faith and fair dealing, and dissolution." In their briefs, Drs. Artz and Stiens included a request for appellate costs and attorney fees.

¶19 We have appellate jurisdiction under Utah Code section 78A-3-102(3)(a).

## Standard of Review

¶20 Whether a claim falls under an arbitration clause is a matter of contractual interpretation,[3] which is reviewed for correctness.[4]

## Analysis

¶21 Dr. Pasquarello brought several claims against Drs. Artz and Stiens, three of which are at issue here: breach of contract, breach of the covenant of good faith and fair dealing, and a demand for dissolution. Dr. Pasquarello contends that the court of appeals erred in affirming the district court's referral to arbitration of these claims, arguing that none of the claims falls under the arbitration clause in the parties' operating agreement. But because each claim implicates an issue covered by the arbitration clause, we disagree with Dr. Pasquarello and affirm the court of appeals.

---

[1] *HITORQ LLC v. TCC Veterinary Servs. Inc.*, 2020 UT App 123, ¶ 30, 473 P.3d 1177.

[2] *Id.* ¶ 51.

[3] *See Zions Mgmt. Servs. v. Record*, 2013 UT 36, ¶ 31, 305 P.3d 1062 (stating that "arbitration is a matter of contract" (citation omitted)).

[4] *Id.* ¶ 11.

¶22 Drs. Artz and Stiens request that we award them reasonable attorney fees incurred in defending the appeal. But because they have not shown they are entitled to fees, we deny the request.

## I.  Because the Claims Involve Disputes Regarding the Enforcement or Interpretation of the Operating Agreement, the Claims Fall Under the Arbitration Clause

¶23 Dr. Pasquarello argues the arbitration clause in the operating agreement does not include an agreement to arbitrate the three claims at issue here because the claims are not based on disputes regarding the enforcement or interpretation of the agreement. We disagree. All three claims require a court to either enforce or interpret the operating agreement in order to resolve the underlying disputes. Because each claim involves a dispute regarding the enforcement or interpretation of the operating agreement, we affirm the court of appeals.

### A.  We Determine Whether a Claim Falls Under an Arbitration Clause by Referring to the Clause's Plain Language

¶24 When parties agree to arbitration, the district court is bound to refer the matter to arbitration.[5] But if a party challenges the appropriateness of arbitration, the Utah Uniform Arbitration Act provides that "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate."[6] An agreement to arbitrate is enforceable only if it "binds the party whose submission to arbitration is sought, and the dispute to be arbitrated . . . fall[s] within the scope of the agreement."[7]

¶25 In this case, Dr. Pasquerello acknowledges that she agreed to the arbitration provision but argues that her claims fall outside the scope of that provision. When parties disagree about the scope of an arbitration clause, we first look to "the language of the arbitration clause at issue."[8] "[I]f the language within the four corners of the

---

[5] *See* UTAH CODE § 78B-11-108(1)(a).

[6] *Id.* § 78B-11-108(1)(b).

[7] *Bybee v. Abdulla*, 2008 UT 35, ¶ 26, 189 P.3d 40 (citations omitted).

[8] *Peterson & Simpson v. IHC Health Servs, Inc.*, 2009 UT 54, ¶ 22, 217 P.3d 716.

contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language."[9] When the language is ambiguous, "there is a presumption in favor of arbitration."[10] But "state and federal policies favoring arbitration cannot be used to defeat the plain language of the parties' contract, nor can they be used to create ambiguities where there are none."[11]

### B. *We Affirm the Court of Appeals Because Each Claim Falls Within the Scope of the Arbitration Clause*

¶26 Dr. Pasquarello argues the court of appeals erred in concluding that the three claims—breach of contract, breach of the covenant of good faith and fair dealing, and dissolution—all fell under the arbitration clause in the parties' operating agreement. But because each claim involves a dispute regarding the enforcement or interpretation of the operating agreement, we disagree and affirm the court of appeals.

¶27 We "look[] first to the plain language" of the arbitration clause,[12] which in this case provides that "[a]ny Member involved in a dispute regarding the enforcement or interpretation of this Agreement may elect to have such dispute referred to non-binding mediation or binding arbitration." When we interpret contractual language, we begin with "the ordinary and usual meaning of the words."[13] So to understand this arbitration clause, we look to the ordinary and usual meanings of the words "dispute," "regarding," "enforcement," and "interpretation."

¶28 As a starting point, there must be a "dispute," meaning "[a] conflict or controversy, esp[ecially] one that has given rise to a

---

[9] *Zions Mgmt. Servs. v. Record*, 2013 UT 36, ¶ 32, 305 P.3d 1062 (citation omitted).

[10] *Bybee*, 2008 UT 35, ¶ 27 (citation omitted). We note that relevant extrinsic evidence may preclude application of the presumption of arbitrability in some cases. But neither party has offered extrinsic evidence in this case, and this issue has not been briefed, so we do not address the issue in this opinion.

[11] *Zions Mgmt. Servs.*, 2013 UT 36, ¶ 36.

[12] *Peterson & Simpson*, 2009 UT 54, ¶ 13.

[13] *Pugh v. Stockdale & Co.*, 570 P.2d 1027, 1029 (Utah 1977).

particular lawsuit."[14] And the ordinary meaning of "regarding" is "with respect to," "concerning,"[15] "in reference or relation to," or "about."[16] So we must determine if Dr. Pasquarello's claims involve conflicts or controversies concerning, about, or relating to the enforcement or interpretation of the operating agreement.

¶29 Next, we turn to enforcement and interpretation. Black's Law Dictionary defines "enforcement" as "[t]he act or process of compelling compliance with a law, mandate, command, decree, or agreement."[17] Because the arbitration clause specifically refers to the operating agreement, it logically refers to "the act or process of compelling compliance" with the operating agreement. And "interpretation" is defined as "[t]he ascertainment of a text's meaning; specific[ally], the determination of how a text most fittingly applies to particular facts."[18]

¶30 Applying the ordinary meaning of these terms, Dr. Pasquarello's claims are covered by the arbitration clause if they involve conflicts or controversies relating to the act or process of compelling compliance with the operating agreement or the ascertainment of the agreement's meaning. The language in this arbitration clause is not ambiguous, so we do not reach the presumption of arbitrability.

1.     Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

¶31 Dr. Pasquarello first argues that the claims for breach of contract and breach of the covenant of good faith and fair dealing involve a dispute about the oral contract between the parties for Dr. Artz's purchase of Dr. Pasquarello's ownership in the business and in the building—not the enforcement or interpretation of the

---

[14] *Dispute*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Dispute*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/dispute (last visited Nov. 26, 2021) (defining dispute as a "verbal controversy").

[15] *Regarding*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/regarding (last visited Nov. 26, 2021).

[16] *Regarding*, OXFORD ENGLISH DICTIONARY (3d ed. 2009).

[17] *Enforcement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[18] *Interpretation*, BLACK'S LAW DICTIONARY (11th ed. 2019).

operating agreement. She contends that this contract is separate from the operating agreement, so it does not involve the enforcement or interpretation of the agreement. But Dr. Pasquarello's argument does not account for the possibility that a dispute relates to multiple topics—here, the oral contract and the underlying operating agreement. Because the breaches alleged by Dr. Pasquarello encompass disputes about both the oral contract and the enforcement of the operating agreement, we affirm the court of appeals.

¶32 As discussed, in determining whether a claim is subject to an arbitration clause, we "look[] first to the plain language within the four corners of the document."[19] Here—where the arbitration clause covers any dispute "regarding the enforcement or interpretation of the operating agreement"—if the claim relates to the enforcement or interpretation of the operating agreement, the claim is subject to arbitration.

¶33 Dr. Pasquarello bases the breach of contract claim on several alleged acts, including that Dr. Artz "[f]ail[ed] to purchase [her] membership interests by November 14, 2015," "[f]ail[ed] to prepare the purchase agreement in a timely manner," "[f]ail[ed] to pay HITORQ profits and accounts receivable by November 14, 2015," and "[p]revent[ed] Pasquarello from working after November 13, 2015." While some of these allegations relate only to the oral contract—such as Dr. Artz's alleged failure to prepare the purchase agreement—others are directly tied to enforcement of, or compelling compliance with, the operating agreement.

¶34 Dr. Pasquarello alleges that Dr. Artz failed to pay HITORQ profits and accounts receivable and wrongfully excluded her from the business. These are essentially allegations that Dr. Artz failed to abide by the operating agreement. The rules for distribution of profits and accounts receivable are set out in Article IV of the operating agreement, and Article VII paragraph 5 outlines the procedure for expelling members from the LLC. So these allegations involve disputes about the enforcement of the operating agreement.

¶35 Similarly, the claim for breach of the covenant of good faith and fair dealing included accusations that Dr. Artz "[w]rongfully

---

[19] *Peterson & Simpson*, 2009 UT 54, ¶ 13.

t[ook] HITORQ's Clinic Debt Payments,"[20] "[d]en[ied] Pasquarello the right to work after November 13, 2015," and voted "to expel HITORQ's Clinic membership." These allegations also point to Dr. Artz's alleged failure to abide by Articles IV and VII of the operating agreement.

¶36 Dr. Pasquarello argues that "[t]he guts of [her] claim was clearly—as pleaded—an oral agreement with no arbitration clause." But "we do not think that an agreement to arbitrate should be interpreted so narrowly that its application may be avoided by choosing to plead one legal theory instead of another."[21] And by incorporating material aspects of the parties' operating agreement into the oral contract, such as paying profits and losses, the parties essentially tied the oral contract to the enforcement of the operating agreement for these issues.

¶37 Dr. Pasquarello acknowledged the materiality of the operating agreement to the claims when she attached it to the complaint and referenced it in support of her claims now at issue. For example, in the good faith and fair dealing portion of Dr. Pasquarello's complaint, she referenced the terms of Article IV of the operating agreement to support her contention that she was owed distributions that she did not receive. Similarly, in support of the breach of contract claim, Dr. Pasquarello referenced a provision in the operating agreement that provides the clinic and real estate memberships must be sold together.

¶38 So even though Dr. Pasquarello contends that these claims are based on an oral agreement separate from the operating agreement, the breaches she described and remedies she sought relate to enforcement of the operating agreement. Both the breach of contract and breach of the covenant of good faith and fair dealing claims involve disputes regarding the enforcement of the operating agreement and, therefore, fall under the arbitration clause.

2. Dissolution

---

[20] We note that the parties referred to profit distributions as "clinic debt payments," so this is the same allegation as in the claim for breach of contract.

[21] *Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 477 n.3 (Utah 1986).

¶39   Dr. Pasquarello also contends that the court of appeals erred in affirming the district court's referral of the dissolution claim to arbitration because that claim is grounded in Utah Code section 48-3a-701. But because Dr. Pasquarello's complaint relies wholly on breaches of the parties' operating agreement to satisfy the dissolution requirements of the statute, we disagree.

¶40   Section 48-3a-701 allows for dissolution of a limited liability company if the managers or members in control of the company "have acted, are acting, or will act in a manner that is illegal or fraudulent" or "in a manner that is oppressive and was, is, or will be directly harmful to the applicant."[22] Dr. Pasquarello repeats this language in the complaint, stating that "[t]he Defendants' [sic] have acted and continue to act in a manner that is illegal, oppressive, and directly harmful to [Dr. Pasquarello]."

¶41   But in support of these statutory grounds for dissolution, Dr. Pasquarello points solely to violations of the operating agreement, claiming that "[t]he Defendants' [sic] denied [her] the rights and benefits of membership in both entities, changed the character, profits and losses of the Clinic and devalued the value of [her] membership. . . . As a result of the Defendants' actions dissolution of the two entities is proper."

¶42   Because, as framed by Dr. Pasquarello, the determination of whether dissolution is proper rests on whether Drs. Artz and Stiens violated the operating agreement, her dissolution claim requires interpretation, or ascertaining the meaning, of the operating agreement. This is sufficient to show the claim encompasses a dispute regarding the interpretation of the operating agreement. We hold that the dissolution claim is encompassed by the parties' arbitration clause. We also hold that the breach of contract and breach of the covenant of good faith and fair dealing fall under the arbitration clause. Accordingly, we affirm the court of appeals.

II.  We Deny the Request for Attorney Fees Because Drs. Artz and Stiens Have Not Shown They Are Entitled to Them

¶43   On appeal, Drs. Artz and Stiens request attorney fees under Utah Code section 78B-11-126(3). In support, they rely primarily on judicial statements discussing Utah's "long-standing" policy of upholding arbitration rulings and discouraging the relitigation of

---

[22] UTAH CODE § 48-3a-701(5).

valid awards.[23] They also point to what they perceive as improper conduct by Dr. Pasquarello, asserting that her pursuit of this case has been at best, unnecessary, and at worst, malicious. They made a similar request to the court of appeals, which that court denied because Dr. Pasquarello's complaint and appeal raised "close question[s]" of law.[24] The court of appeals also noted that Drs. Artz and Stiens had not sufficiently addressed the policy considerations in favor of and against an award of fees in their briefs.[25]

¶44 Drs. Artz and Stiens have not filed a cross appeal, so they do not challenge the court of appeals' denial of fees. We therefore understand their current request as one for fees incurred solely in their appeal to this court. And while we acknowledge that Drs. Artz and Stiens have tried to fix the deficiencies that the court of appeals identified in their briefing by addressing relevant policy considerations, we nevertheless decline to award fees because Dr. Pasquarello has again raised a "legitimate concern[] about the legal validity" of the arbitrator's decision and its subsequent confirmation by the district court and the court of appeals.[26]

¶45 Utah Code section 78B-11-126(3) states that a court may award the prevailing party "reasonable attorney fees and other reasonable expenses of litigation incurred in a judicial proceeding" contesting an arbitration award. Such an award is not automatic but rather is "left to the discretion of the court."[27] In exercising this discretion in the past, we have considered two competing policies. The first, which serves as the basis for Drs. Artz and Stiens's request, is to disincentivize the unnecessary relitigation of legitimate arbitration awards.[28] But this consideration must be balanced with the danger of placing an undue burden on a party with "legitimate

---

[23] *See Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 946, 953 (Utah 1996); *Eco Box Fabricators LLC v. Zweigle*, 2020 UT App 133, ¶ 12, 475 P.3d 146.

[24] *HITORQ LLC v. TCC Veterinary Servs. Inc.*, 2020 UT App 123, ¶ 45, 473 P.3d 1177.

[25] *Id.* ¶ 58.

[26] *Duke v. Graham*, 2007 UT 31, ¶ 31, 158 P.3d 540.

[27] *Duke*, 2007 UT 31, ¶ 31; *see also Paul deGroot Bldg.Servs., L.L.C. v. Gallacher*, 2005 UT 20, ¶ 23, 112 P.3d 490.

[28] *Buzas Baseball*, 925 P.2d at 953.

concerns about the legal validity of an award."[29] We addressed this balancing act in *Duke*, where we stated that "[a]n appeal that has little legal support would likely merit an award of fees . . . while a close case would not."[30]

¶46  In *Duke*, an issue arose between the four founding members of a limited liability company.[31] Consistent with the company's operating agreement, the members submitted the dispute to arbitration. To resolve the dispute, the arbitrator removed two of the four founders from the company.[32] The two removed founders then challenged the arbitrator's ruling in district court, arguing that the arbitrator did not have authority to remove them from the company.[33] The district court rejected their challenge, so they appealed to this court.[34] Both parties to the dispute requested attorney fees on appeal.[35] We ultimately affirmed the district court and awarded attorney fees to the defendants.[36] In reaching this outcome, we considered the "broad" grant of authority to arbitrators in Utah's Arbitration Act and our own "clear precedent" upholding arbitration awards in similar instances.[37] We therefore concluded that the plaintiffs' claim had "little legal support" and granted the defendants' request for fees.[38]

¶47  Turning to Drs. Artz and Steins's request for fees, unlike the controversy in *Duke*, the issues Dr. Pasquarello presented in this case do not fall within clear judicial precedent. To the contrary, the court of appeals determined that Utah case law on this issue was "sparse."[39] And we agree with the court of appeals that the

---

[29] *Duke*, 2007 UT 31, ¶ 31.

[30] *Id.* ¶ 32.

[31] *Id.* ¶¶ 2–3.

[32] *Id.* ¶ 3.

[33] *Id.* ¶ 4.

[34] *Id.* ¶¶ 4–5.

[35] *Id.* ¶ 13.

[36] *Id.* ¶ 32.

[37] *Id.*

[38] *Id.*

[39] *HITORQ LLC*, 2020 UT App 123, ¶ 31.

applicability of the arbitration clause to Dr. Pasquarello's claims was "a close call."[40]

¶48 While Drs. Artz and Stiens have presented valid policy concerns in support of their request for fees, Dr. Pasquarello has raised "legitimate concerns about the legal validity of" the arbitrator's decision.[41] Accordingly, we decline to award attorney fees.

**Conclusion**

¶49 Because each of Dr. Pasquarello's claims falls within the arbitration clause, we affirm the court of appeals' holding that the district court correctly compelled arbitration.

¶50 We also reject Drs. Artz and Stiens's request for appellate costs and fees because we conclude that Dr. Pasquarello has raised valid concerns, and included legal support, regarding the legitimacy of the arbitration award.

---

[40] *Id.* ¶ 40.

[41] *Duke*, 2007 UT 31, ¶ 31.